IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| JOHN E. BAKER II,<br><br>      Plaintiff,<br><br>      v.<br><br>THE CITY OF CHARLESTON; TAMMY O'BERRY, individually; and LEE WILDER, individually,<br><br>      Defendants. | 2:26-cv-3000-RMG<br><br><br><br>**(Jury Trial Demanded)** |

## COMPLAINT

Plaintiff John E. Baker II is the President of the International Association of Fire Fighters Local 61 ("the Local") and a former Fire Engineer for the Charleston Fire Department ("CFD"). From March 2025 until February 2026, he represented the Local in a now-settled lawsuit before this Court alleging that CFD retaliated against a member, Robert Tackett, for informing the Local about the unbearable heat in his fire station instead of utilizing CFD's chain-of-command. *Tackett v. City of Charleston*, 2:25-cv-01338-RMG ("*Tackett*" or "the *Tackett* litigation"). With extraordinary effrontery, the City terminated Baker shortly after settlement, citing texts that the Local produced during discovery. According to the City, a handful of those texts revealed serious misconduct, including that Baker used one slur, "towel head," in a long series of text messages from his private cell phone while off duty to another fire fighter's private cell phone when they were discussing how to remedy harmful working conditions at a CFD fire station; that he forwarded texts from the CFD Fire Chief to another fire fighter; and that he failed to produce in discovery the *exact* messages he had actually produced in discovery—*which is why the City was aware of Baker's text messages in the first place.*

The City, however, did not terminate Baker because he used one slur in a private text message with one of his union members, because he forwarded two of the Fire Chief's texts to one of his union members, or because he failed to produce evidence in the *Tackett* litigation, which he actually provided. It terminated Baker to punish him for acting on behalf of the Local in its retaliation suit against the City and for advocating for safer conditions for firefighters in CFD fire stations as the Local President. The strained justifications provided to disguise this motive by Department of Human Resources and Organizational Development Director Tammy O'Berry and Employee Relations Manager Wilder—the City employees who investigated Baker, found him guilty of misconduct, recommended discipline, and provided final approval for his termination—show only that the City wanted to get rid of Baker by any means possible.

Baker accordingly brings this action against the City, Director O'Berry, and Manager Wilder under 42 U.S.C. § 1983 for terminating him in violation of his clearly established First Amendment speech, association, and petition rights. He prays for an order from this court directing Defendants to reinstate him, restore the salary and benefits he would receive but for Defendants' constitutional violations, and compensate him for his lost wages and benefits and attorneys' fees and costs.

## JURISDICTION

1. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, because Baker's claims arise under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.

2. Venue is proper in this district under 28 U.S.C. § 1391, because Defendants are located within the District of South Carolina and the events and omissions giving rise to this action occurred in the District of South Carolina.

**BACKGROUND**

3.     Charleston is a city formed under the laws of South Carolina.

4.     The Department of Human Resources and Organizational Development ("HR") develops and enforces employment policy for the City. Charleston, S.C., Code § 2-221. Defendant Tammy O'Berry is the Director of HR and promulgates official City employment policy. Charleston, S.C., Code § 2-222. Defendant Lee Wilder is an Employee Relations Manager for HR.

5.     CFD provides fire protection and prevention services for the City. From August 5, 2019, until May 29, 2026, CFD employed Baker as a fire fighter and, at the time of his termination, a Fire Engineer. During those nearly seven years of service, Baker received numerous awards—including a Community Outreach Award in 2022 and multiple "life-saving" awards—without any discipline, save for one tardy note.

6.     In August 2023, Baker was elected President of the Local, an organization formed to advocate for better pay and working conditions for CFD fire fighters. As President, Baker ensures that members' rights are respected, helps members navigate the City's grievance procedure, and generally voices members' concerns to CFD.

7.     Among Local members' top concerns are the health hazards in CFD fire stations. Fire fighters have repeatedly reported the presence of cockroaches, rats, termites, sewage backups, and HVAC-related issues in their stations to CFD without avail. On May 11, 2026, an investigative report by a local news outlet (Live5news)[1] showed that fire fighters in 12 out of 17 stations reported mold, that the City had "dozens of potential mold findings," that four fire fighters sought

---

[1]     Emily Johnson and Jeff McGee, *They Think we're replaceable: Charleston firefighters say city ignored years of mold dangers*, Live5 (May 11, 2026) 'They think we're replaceable': Charleston firefighters say city ignored years of mold dangers.

medical treatment for their mold exposure, and that fire fighters' reports about mold exposure received short shrift from their superiors.

8. For example, one fire fighter wrote that the water leaks and mold issues in his station had been reported multiple times, but "the problem has never been fixed and continues to become progressively worse." Another wrote that, even after renovations, "the mold in the bathroom was not corrected and he could still see/smell mold." Another asked, "Is the mold issue going to be ignored? Can anyone ensure the mold that was growing was not hazardous?" And another: "We in operations are held to a standard and held accountable for our actions. I ask you, who holds the city accountable?" One fire chief even recounted that Deputy Chief Jason Krusen said that fire fighters were "being wimpy, cry babies."

9. When an HVAC malfunction caused the bunk rooms in former CFD fire fighter Robert Tackett's fire station to exceed 90 degrees on July 17, 2024, Tackett texted Baker—the President of the organization formed to advocate for better working conditions—to urge CFD to fix the station's HVAC problems, and Baker voiced Tackett's concerns to Fire Chief Daniel Curia. After Curia learned that it was Tackett who initially talked to the Local, Curia told one of Tackett's supervisors to "find something" in the code of conduct to "write up" Tackett for and, on July 26, 2024, transferred him to another station.

10. The mold growth in Tackett's station, Station No. 9, eventually required its temporary closure in November 2024 to replace the HVAC system Tackett complained about. A news story covering that closure reported that CFD received a mold assessment documenting elevated

"visible mold in six of the rooms," and recommending mold remediation "as soon as possible," in August 2024—three months before CFD relocated its fire fighters to another station.[2]

11.     On March 4, 2025, Tackett and the Local sued CFD and Fire Chief Curia in the District of South Carolina for violating their clearly established First Amendment speech and association rights. *Tackett v. City of Charleston*, 2:25-cv-01338-RMG ("*Tackett*" or "the *Tackett* litigation"). Specifically, the *Tackett* plaintiffs claimed that Curia disciplined Tackett (1) to punish him for associating with the Local by reporting the health hazards in his station, in violation of Tackett's First Amendment right to associate with the Local, and (2) to chill other fire fighters from joining the Local or talking to the Local about their workplace concerns, in violation of the Local's First Amendment right to associate with its members. (*Tackett*, ECF No. 16 at 8-9).

12.     As part of the discovery process in that case, the defendants requested the Local produce "[a]ny and all communications between [Tackett] and [the Local], including any of its members or officers . . . regarding alleged dangerous and deficient conditions at Station No. 9 from January 1, 2024, to the present," as well as "[a]ll communications . . . by Plaintiff's officers with any current or former member of Local 61 . . . regarding the allegations in the Amended Complaint." And on October 27, 2025, the Local produced nearly one hundred screenshots of responsive text messages between Baker and Tackett.

13.     CFD would later cite six of the screenshots the Local produced to justify terminating Baker.

    a.     In two screenshots of messages on July 17, 2024, Tackett and Baker discussed the 92-degree Fahrenheit temperatures in the bunk rooms. After Tackett expressed

---

[2]     Anna Harris, *Charleston temporarily closes fire station with HVAC issues dating back years*, Live5 (Nov. 26, 2024), Charleston temporarily closes fire station with HVAC issues dating back years.

appreciation to Baker for talking to Curia (and Baker vowed that he will "always advocate brother"), Baker asked whether Station No. 9 was "getting any Saudi's [sic]," apparently referencing a group of fire fighters visiting from Saudi Arabia as part of a fire fighter exchange program. When Tackett responded that Station No. 9 would, but there were only four bunk rooms with functioning air conditioning, Baker responded, "So a towel head would be in the hot... that would be unacceptable." Tackett responded, "That'll make em fix it." The import of Baker's message was that while CFD and the City would not fix the air conditioning in Station No. 9 to ensure that its firefighters were well rested and prepared to protect members of the community, CFD and the City would not hesitate to fix the air conditioning to ensure that visiting dignitaries did not have to endure adverse conditions.

b.      In one screenshot dated August 3, 2024, Baker stated, "Go ahead and let's do the process file the grieve [sic] and then ask where your feedback form is." Tackett responded, "Ok. I'm out sick today because I have family in town. I'll knock it out Tuesday." And Baker reacted with a thumbs-up to Tackett's message. For some reason, CFD and the City assert this is evidence of Baker encouraging Tackett to commit sick-leave fraud, something CFD never alleged against Tackett, instead of evidence of Baker simply affirming that Tackett will file the requested grievance on Tuesday.

c.      In two screenshots of messages dated July 18, 2024, Baker forwarded Tackett a copy of Chief Curia's text stating that he was "disturbed that the chain of response failed so badly but . . . VERY appreciative that you sent me the information." The screenshot also showed Baker's response explaining that "morale isn't at its highest, and the trust factor is quite low," so he appreciated Curia's quick and caring response. Baker received and sent these text messages in his role as President of the Local, and at no time was Baker

under instruction from Curia or anyone else not to forward these text messages to union members.

       d.      In one screenshot of messages dated July 24, 2024, Tackett texted Baker that his supervisor, Battalion Chief Anthony Morley, "was literally going through our code of conduct stop [sic] looking for something. They were told to just find something to write me up for." And Baker responded, "get it in writing . . . . Or record it." In responding to Tackett, Baker was acting in his capacity as President of the Local, and he was advising one of his union members to take action to protect himself from unwarranted discipline.

14.      On November 18, 2025, counsel for the defendants informed the Court that the parties had reached a resolution of the *Tackett* litigation. (*Tackett*, ECF No. 30). And on February 4, 2026, the parties filed stipulations of dismissal. (*Tackett*, ECF Nos. 32, 33, and 34).

15.      A few months later, on April 29, 2026, Fire Chief Curia sent Baker a "Human Resources Inquiry" explaining that, "[a]fter resolution of the Local 61/Tackett v. City of Charleston lawsuit," he was provided with the texts produced during discovery, some of which "contained a racial slur and other information inconsistent with [his] position and with the department and City operations." "Out of an abundance of caution," and to avoid any "perception of bias in light of the recent lawsuit and the personal involvement of myself and Chief Cockcroft as named defendants," Curia claims, he "turned over the information to the Director of Human Resources, Tammy O'Berry, to review and determine whether and what action is appropriate." In the meantime, Baker continued to work as a Fire Engineer for CFD.

16.      On or around May 3, 2026, President Baker received an email from Manager Wilder instructing him to appear for an interview with himself and Director O'Berry on Monday, May 4, 2026. When President Baker requested to have a witness attend the interview with him, Manager

Wilder refused. And when Baker arrived for the interview, Manager Wilder instructed Baker to power down his phone to prevent him from making an audio recording. Wilder gave this instruction to avoid scrutiny of his and Director O'Berry's questions and Baker's responses.

17.     Director O'Berry and Manager Wilder later wrote a report titled "Investigative Findings and Conclusions" ("the Report"), purporting to outline four "specific concerns raised by the texts, Mr. Baker's position" during the May 4 interview, "and the findings and conclusions of the investigation." Attached to the Report are copies of the six screenshots (described above) which were purportedly of "most concern."

18.     The Report explains that Baker admitted that his use of the slur "towel head" was wrong during his interview. And it claims that, if the text got out in the community, citizens of middle eastern origin might be concerned that they would not be helped or treated fairly if they were to need first responder help. The Report reasons that Baker's comment "has very real potential to disrupt the primary function of fire operations."

19.     When Baker made the slur, he was communicating with a union member through private text messages off-duty in his capacity as President of the Local, not as an employee of CFD or the City, about issues with working conditions at CFD fire stations. Thus, the City terminated Baker because of his actions as President of the Local.

20.     At no time were Baker's private text messages to one of his members at issue in his termination published to the public or otherwise accessible to members of the public or the Charleston community.

21.     Baker's one-time use of a slur in a private text message conversation with one of his union members does not and did not have "very real potential to disrupt the primary function of fire operations." He used the slur in a text message from his personal cell phone to another fire

fighter's personal cell phone while off duty, so it is not subject to public disclosure under South Carolina's FOIA law.[3] Even if it were, the Report does not even attempt to explain how public disclosure of the message could "disrupt the primary function of fire operations"—the provision of emergency response services.

22.     Director O'Berry and Wilder would not have considered an employee's one-time use of a slur in a private text message sent while off duty to constitute misconduct (let alone terminable misconduct) if the Local had not sued CFD and Chief Curia and Baker had not advocated for improvements in working conditions for firefighters. They considered this misconduct to punish Baker for his advocacy and participation in *Tackett* and to chill others from discussing health hazards in their fire stations, associating with the Local, and suing CFD. And they falsely stated that the message could disrupt CFD's emergency response service to disguise their real motivation for terminating Baker.

23.     Second, the Report claims that "one of the most serious concerns" is that Baker tampered with evidence in his discovery responses. It states that some messages "were produced by FF Tackett from Tackett's phone" and some "were produced by Eng. Baker from Baker's phone." But they claim that "missing from Eng. Baker's production is the text in which he used the racial slur 'towel head,'" and "the concern raised is that he tampered with that evidence and did not give a complete response."

24.     Contrary to the City's assertion, the Local, of which Baker was the President, actually produced both screenshots (the screenshot from Tackett's perspective and the screenshot from

---

[3]     S.C. Code. Ann. § 30-4-20(c) (definition of public record extending to records "in the possession of, or retained by a public body"). Tackett and Baker's texts were not records retained by the public body—that's why the *Tackett* defendants requested them.

Baker's perspective) in the *Tackett* litigation in response to the City's and Curia's request for production 16 and 20 at Bates pages 0068 and 0069.

25.     Specifically, in RFP 16 to the Local, the City requested:

Any and all communication between Plaintiff Robert Tackett and Local 61, including any of its members or officers, including but not limited to emails, text messages, instant messages, messages on any messaging platform such as Signal or WhatsApp or other written correspondence regarding alleged dangerous and deficient conditions at Station No. 9 from January 1, 2024, to the present. (If Plaintiff or its officers previously had care, custody or control of such documents or communications but such are no longer available, describe why the documents or communications are no longer available.)

26.     And the Local responded: "Plaintiff has produced responsive non-privileged documents within its care, custody, and control in Plaintiffs Supplemental Responses at Bates # 0062 – 157."

27.     In RFP 20 to the Local, the City requested:

All communications (i.e., including e-mail, text messages, instant messages and/or messages on any platform such as Facebook, Instagram, WhatsApp, Signal, etc.) by Plaintiff's officers with any current or former member of Local 61 for the time period of January 1, 2024, to the present, regarding the allegations in the Amended Complaint. (If Plaintiff previously had care, custody or control of such documents or communications but such are no longer available, describe why the documents or communications are no longer available.)

28.     And the Local responded:

Plaintiff objects that the request is duplicative, overbroad, seeks to impose obligations that exceed the scope of the Federal Rules of Civil Procedure, and captures privileged union communications. Compelling disclosure of identities of members engaged in protected associational activity, including most notably conversations about the matters of public concern raised in the Amended Complaint, would chill protected association. Subject to those objections and in express reliance thereon, Plaintiff has produced responsive communications within his possession, custody, and control in Plaintiffs Supplemental Responses at Bates pages 0062 – 0155.

29.     To the extent that Baker had any involvement in the Local's production of discovery in the *Tackett* litigation, Baker was acting as President of the Local, not as a CFD or City employee. Thus, the City terminated Baker because of his actions as President of the Local.

10

30.    In addition to punishing Baker for the Local's discovery production, Director O'Berry and Manager Wilder knew that the Local produced the text message with Baker's use of the word "towel head" because *this production was the reason they were aware of Baker's texts at all*. The very screenshots attached to the Report ostensibly demonstrating Baker's evidence tampering even bear the Bates numbers that were cited in the Local's discovery responses, 0068 and 0069, in red in the lower right-hand corner!

31.    Nevertheless, Director O'Berry and Manager Wilder falsely claimed in the Report that "missing from Eng. Baker's production is the text in which he used the racial slur towel head." And they falsely told Baker during the May 4 interview that he failed to produce the messages. Then, according to their own Report, they repeatedly asked him why not: "Then he was asked why he didn't produce the 'towel head' text *in any form during discovery*."

32.    Because Baker did not compile the Local's discovery responses (the Local's attorney did), and therefore he did not know what the Local's attorney had produced in discovery, he admitted that his entire text should have been produced in discovery in the lawsuit. Baker stated this, because, although he regretted stating a slur in a private text message conversation that he had in his capacity as President of the Local with one of its members, he was not trying to hide it from anyone.

33.    Director O'Berry and Manager Wilder knowingly lied to Baker during his May 4 interview to try to extract a false confession from him that he engaged in evidence tampering of some kind. They did so to try to find a pretextual reason to punish him for his advocacy and participation in *Tackett* and to chill others from discussing health hazards in their fire stations, associating with the Local, and suing CFD. And they falsely stated that Baker committed evidence tampering to disguise their real motivation for terminating him.

34.     Third, the Report claims that Baker "forwarded to Tackett a copy of a contemporaneous text exchange between Eng. Baker and Chief Curia." And even though Baker texted Chief Curia that they "trust each other, . . . when Baker is texting to FF Tackett, the tone is the very opposite—as though Chief Curia cannot be trusted and does not care about him." Director O'Berry and Manager Wilder lament, "We have no way of knowing whether Eng. Baker sincerely trusts Chief Curia or not," but they summarily claim that Baker's "purpose in giving the opposing accounts gives a strong appearance of intentionally dividing leadership and personnel into opposite 'sides,'" and "jeopardizes the efficiency of the team on whole [sic] during emergency responses where it is important that personnel follow instructions. It also is dishonest."

35.     Baker was terminated by the City for communicating an email he received as President of the Local from Chief Curia regarding the process for resolution of a workplace issue to a union member and for expressing to that union member, as President of the Local, that senior management cannot be trusted to resolve serious workplace issues, such as mold and vermin in fire stations and broken down air conditioning systems in the heat of summer. At no point was Baker under orders not to communicate communications that he received from Chief Curia to his union members nor was he under orders not to criticize Chief Curia to his union members. Thus, the City terminated Baker because of his actions as President of the Local.

36.     Furthermore, forwarding Chief Curia's response to Tackett does not indicate dishonesty or distrust, distrusting one's boss is not misconduct (let alone terminable misconduct), and these texts could not reasonably "jeopardize the efficiency of the team on whole during emergency responses"—Director O'Berry and Manager Wilder do not explain how they could do so. Moreover, Baker was acting in his capacity as Local President when he forwarded Chief Curia's response to Tackett to explain how Chief Curia responded to Tackett's concerns.

37.     Director O'Berry and Wilder would not have considered this misconduct if the Local and Tackett had not sued CFD and Chief Curia and Baker had not advocated for improvements in working conditions for firefighters. They concluded Baker engaged in misconduct to punish Baker for his advocacy and participation in *Tackett* and to chill others from discussing health hazards in their fire stations, associating with the Local, and suing CFD. And they falsely stated that forwarding Chief Curia's message could "jeopardize efficiency of the team on whole during emergency responses" to disguise their real motivation for terminating Baker.

38.     Finally, the Report expresses concern that, in one screenshot, Tackett disclosed that he called in "sick" because he had family visiting, and Baker reacted with a thumbs up, "which generally represents approval or agreement." Because "paid sick leave should only be used for sickness of the employee or certain family members for whom the employee is caring," and "Baker sometimes serves as an acting captain" (though not over Tackett), and "[l]ower-level employees look to supervisors to set the example and tone of conduct at the workplace," and "[a]llowing subordinates to break the rules sometimes and not others sends mixed messages and implies that the rules are not important," and "[d]iscipline and adherence is critical during emergency situations to protect the safety of personnel and citizens," and "[t]he only effective way to ensure rules will be followed in emergency situations is to stress and enforce them on an everyday basis," HR reasoned that Baker's thumbs-up "is not consistent with the City's expectations of its supervisors."

39.     Regardless of Baker's intent with the thumbs-up emoji, Baker was communicating with Tackett in his capacity as President of the Local, not as a supervisor for CFD, and with Tackett in his capacity as a union member. Thus, the City terminated Baker because of his actions as President of the Local.

40. Moreover, Tackett's message does not show that he engaged in sick time abuse. He complied with all relevant CFD procedures for sick time, including receiving a doctor's note and providing it to CFD. At no time did CFD or the City accuse Tackett of misuse of sick leave. Baker knew that Tackett would have had to provide a sick note to be approved for sick leave, and he had no reason to believe he somehow engaged in sick time abuse. In any case, Baker indicated "approval or agreement" of Tackett's statement that he would complete his grievance challenging his unlawful termination the following day—the thing Baker had asked him to do in the previous message—not approval or agreement of his taking of sick leave.

41. Baker was terminated by the City for communications he made in his capacity as Local President, not as a supervisor for or employee of CFD, when he was texting with Tackett, a union member, about the grievance procedure. Thus, the City terminated Baker because of his actions as President of the Local.

42. Director O'Berry and Manager Wilder would not have concluded Baker's text constituted misconduct if the Local and Tackett had not sued CFD and Chief Curia and Baker had not advocated for improvements in working conditions for firefighters. They characterized Baker's texts as misconduct to punish Baker for his advocacy and participation in *Tackett* and to chill others from discussing health hazards in their fire stations, associating with the Local, and suing CFD. And they claimed Baker endorsed sick time abuse to disguise their real motivation for terminating Baker.

43. Director O'Berry and Manager Wilder conclude their report by finding that Baker engaged in misconduct and recommending that "at a ***minimum***, he be demoted to a rank in which he will have no supervisory responsibility." Though "the determination of what action should be taken should be made at the department level," they specifically stated, "CFD should submit its

14

determination to HR and legal for final approval as is required under City practices for all discipline greater than a formal written warning."

44.    Director O'Berry and Manager Wilder stated that Baker "engaged in misconduct, including significant untruthfulness," to punish him for his participation in *Tackett* and for advocating for union members and resolution of their working condition issues; to chill others from discussing health hazards in their fire stations, associating with the Local, and suing CFD; and to disguise their real motivation for recommending discipline.

45.    On May 19, 2026—a week after Live5news published its report documenting the health hazards in CFD fire stations—CFD placed Baker on Administrative Leave.

46.    On May 26, 2026, Baker was instructed to report to CFD Headquarters the following day for a meeting. At the meeting, Deputy Chief Krusen informed Baker that CFD had decided to terminate his employment and handed him a letter from Manager Wilder ("the Termination Letter") notifying Baker that his employment was terminated.

47.    While Baker expressed sincere regret for using a slur in his private conversations as Local President with a union member, he did not manipulate or omit evidence, was not "complicit" in Tackett's purported "misuse" of sick leave, did not urge another fire fighter to surreptitiously record meetings with a supervisor, and was not engaged in "efforts to undermine department leadership" by forwarding one of Fire Chief Curia's texts to another fire fighter.

48.    Director O'Berry reviewed and approved CFD's decision to terminate Baker prior to the May 27 meeting.

49.    Though the Termination Letter stated that Baker's termination was effective immediately, Deputy Chief Krusen told Baker that the City would pay him $7,778.35 to resign, release his claims against the City, and sign a non-disclosure agreement. When Baker refused to do so by

Friday, May 29, 2026, Wilder terminated him. Wilder did so upon the direction and with the approval of Director O'Berry.

50.     As a result of Baker's termination, he has suffered reputational harm, lost wages and endured other economic harms. As a result of Director O'Berry and Manager Wilder's false statements in the Report and Termination Letter, which were reported by local news, Baker has suffered additional reputational harm.

## CLAIM FOR RELIEF

**42 U.S.C. § 1983 – Retaliation in Violation of President Baker's First and Fourteenth Amendment Rights to Speech, Association, and Petition**

51.     President Baker realleges and incorporates the allegations set forth in paragraphs 1 through 50.

52.     The First and Fourteenth Amendments to the United States Constitution protect public employees' rights to speak as private citizens on matters of public concern, to associate with others, to petition the government for a redress of grievances, and to be free from retaliation from their public employers for doing so.

53.     Safe and efficient operation of fire departments; fire prevention, safety, and response; safe and adequate working conditions for public employees; employers' knowing exposure of employees to health hazards; and labor disputes concerning fire fighters' hours, wages, and working conditions are all clearly established matters of public concern as a matter of law.

54.     Health hazards in CFD fire stations, indifference to fire fighters' complaints about those hazards, and retaliatory response to fire fighters' complaints are matters of public concern as a matter of fact. CFD Fire Chief Curia agreed that the health hazards in fire stations are matters of public concern when he stated, "A third of a firefighters' life is spent in the firehouse; it is their home away from home. When we have issues, if it's termites, if it's mold, we take all of those very

16

seriously," and "I want our firefighters to know that there's no denying that we have had issues in our facilities, and some of them have been corrected, some of them are works in progress." Deputy Chief Krusen agreed that the health and safety of CFD fire stations are a matter of public concern when he stated: "Running emergency calls is dangerous and we want them to feel safe in the buildings they live in while they're here at work. *So it is important* and we advocate for that," (emphasis added), and when he wrote in a 2021 email, "This is a serious issue that is likely presenting health complications to the members."

55.    Director O'Berry and Manager Wilder terminated Baker on May 29, 2026, for his speech as a citizen on matters of public concern, for the associational activities of acting as and carrying out his duties as President of the Local, and for assisting the Local petition the government in its lawsuit against CFD for First Amendment retaliation. The actions for which Baker was terminated all involve actions which he engaged in off duty in his capacity as President of the Local on behalf of his members. None of the actions for which Baker was terminated involve actions which he engaged in while on duty or in his capacity as an employee of CFD or the City. Furthermore, none of the text messages between Baker and Tackett that the Local produced during discovery in *Tackett* show that Baker engaged in employee misconduct, impermissibly interfered with CFD provision of fire rescue services, or could plausibly impermissibly interfere with CFD provision of fire rescue services.

56.    Director O'Berry and Manager Wilder found Baker guilty of misconduct to punish him for associational actions he undertook as President of the Local and for his role as President of the Local, for the protected speech activity in his text messages, and for assisting the Local in the *Tackett* lawsuit, in violation of Baker's First Amendment rights. O'Berry directed Wilder to terminate Baker to punish him for his associational actions he undertook as President of the Local

and for his role as President of the Local, for his protected speech activity, and for assisting the Local in the *Tackett* lawsuit, in violation of Baker's First Amendment rights.

57.     O'Berry and Wilder would not have terminated Baker if he had not been President of the Local, had not advocated on behalf of his members, and had not assisted the Local in its lawsuit against CFD for First Amendment retaliation. O'Berry and Wilder terminated Baker to chill CFD fire fighters from associating with the Local, discussing the health hazards in CFD fire stations, and for bringing suit against CFD for its constitutional violations.

58.     It is well established that terminating an employee for his officer position with a union, for his actions as president of his union, for the speech contained in Baker's texts, and for assisting a union in a lawsuit violates public employees' First Amendment speech, association, and petition rights, and a reasonable HR Director or City official would know as much.

59.     Director O'Berry is the City's final policymaker for employment related policies, and her policies are not subject to review by any superior City authority. Her decision to discipline and terminate Baker therefore constituted an official policy of the City for which it is monetarily liable.

60.     Defendants' violation of Baker's First Amendment speech, petition, and association right was done in a knowing, willful, wanton, reckless, and bad faith manner, which violates clearly established constitutional provisions and rights which a reasonable person would have known.

61.     As a direct, foreseeable, and proximate result of Defendants' unlawful conduct, Baker has suffered and will continue to suffer economic injury, harm to his reputation, humiliation, embarrassment, and other injuries and irreparable harm.

62.     Defendants are also liable for Plaintiff's reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b).

**PRAYER FOR RELIEF**

Accordingly, President Baker requests that this Court enter an order awarding the following relief:

A.      Declaring that Defendants unlawfully violated his and Local members' First and Fourteenth Amendment speech, association, and petition rights,

B.      Enjoining Defendants from continuing to unlawfully violate his and Local members' First and Fourteenth Amendment speech, association, and petition rights,

C.      Ordering Defendants to remove Baker's discipline from his personnel file,

D.      Ordering Defendants to reinstate Baker with the salary, benefits, and other entitlements of employment he would otherwise receive but for Defendants' constitutional violation,

E.      Awarding Baker compensatory damages for lost wages and benefits resulting from Defendants' constitutional violations,

F.      Awarding Baker's attorneys' fees and costs, and

G.      Awarding Baker any other relief to which he is entitled and which this Court deems necessary and proper.


A jury trial is demanded for all claims triable by jury.

Respectfully submitted,

/s/ Ryan C. Andrews
Ryan C. Andrews
Law Office of Ryan C. Andrews LLC
1643B Savannah Highway
#309
Charleston, SC 29407
(843) 278-0068
ryan@ryancandrewslaw.com

/s/ Clark Gebhart
Clark Gebhart
(*Motion for Special Admission to Follow*)
Brian Petruska
(*Motion for Special Admission to Follow*)
Mooney, Green, Saindon, Murphy & Welch, P.C.
1620 I Street NW, Suite 700
Washington, D.C. 20006
Phone: (720) 441-7838
cgebhart@mooneygreen.com

*Counsel for Plaintiffs*

20